**UNITED STATES of America,
Plaintiff,**

v.

**Joshua LARSON, Defendant.**

**No. CR 07–07–BU–DWM.**

United States District Court,
D. Montana,
Butte Division.

June 5, 2008.

Marcia Hurd, U.S. Attorneys Office, Billings, MT, for Plaintiff.

Michael Donahoe, Federal Defenders of Montana, Helena, MT, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DONALD W. MOLLOY, District Judge.

### I. Introduction

Joshua Larson is twenty-one years old. He has the mental capacity of a nine-year-old child. He wets his bed. He lives in squalor and filth, surrounded by garbage and dog feces. He cannot ride a bike. He is incapable of driving a car. He is the product of special education and has a tested I.Q. of just over 70. Joshua reads

at a third-grade level, spells at a third-grade level, and has the arithmetic skill of a second grader. While he can do simple addition and subtraction, he is incapable of division or multiplication. On March 23, 2007, the United States of America indicted Joshua for the receipt and possession of child pornography. If convicted, Joshua faces a mandatory minimum sentence of five years in a federal prison, and a maximum sentence of ten years. The question here is what to do with Joshua, considering that he is guilty on both counts.

## II. Findings of Fact

This case was tried without a jury on October 10, 2007. While the facts are simple enough, the consequences of the prosecution are not. An investigation of Joshua stemmed from the Wyoming ICAC identifying IP addresses which were downloading digital information known to contain child pornography. The locations of the IP addresses were found by sending subpoenas to Bresnan Communications, which in turn provided information corresponding to the IP accounts. Through this process agents located an IP address assigned to Lance Larson, Joshua's father, at 1305 Sunset Road in Butte, Montana. This is where Joshua lived with his mother and his father.

A search warrant was executed on November 30, 2006, early in the morning. The agents executing the warrant were greeted by Lance Larson, who told them that his wife Debbie and his son Joshua were both in the house. The occupants of the house were surprised that law enforcement officers were there with a warrant. What the law enforcement officers encountered in terms of filth and chaos is shown in exhibits 2–2, 2–4, 2–6, 2–8, 2–9, 2–14, and 2–15. The home was unkempt, filthy, in disarray and full of garbage. The house was strewn with dirty clothing, fast-food receptacles, cans, and debris that covered the floor and the furniture. There was one dog in the home, and he had left his mark with piles of excrement. In addition to this chaos the agents found four computers, all connected to the internet.

About twenty-five minutes after beginning the search the agents interviewed Joshua, his father, and his mother. They immediately ruled out Debbie Larson as a suspect because she told them she had no knowledge of any child pornography in the house. Lance Larson was interrogated next, and the agents thought he was a potential suspect even though he, like his wife, made no admissions about child pornography and denied seeing child pornography in the home. He admitted to having adult pornography, and reported that he had seen adult pornography on Joshua's computer and "told him not to do it". Strangely, the government elicited testimony from the agents at trial that neither Joshua's mother, nor his father, voluntarily raised an issue about Joshua's intellectual impairment. In my view, this testimony was self-serving and represents a feeble attempt to answer the obvious question this case presents: why was Joshua prosecuted?

After the agents examined the parents they turned their attention to Joshua. He seemed nervous and he stammered a bit more than the usual suspect being questioned. Joshua confirmed he was using file-sharing programs and that he had used both Bresnan and AOL in the past. He claimed he had been using the internet for four years. When asked for a driver's license, Joshua told the agent he didn't have one and that all he had was an ID card. For a twenty-one year old male this fact would be strange, even in Butte, Montana. There was no indication, however, of curiosity on the part of the agents in light of this fact, or in light of the strange circumstances of Joshua's living environment. This testimony seemed to merely

suggest that adverse inferences should be drawn from Joshua's failure to raise questions himself or to offer information concerning his own mental capacity. He did describe being able to use file sharing programs and to download Hentai (anime cartoon) pornography. Joshua admitted to downloading child pornography ten times each week and told the agent that when he first saw child pornography he had deleted it. He disclosed that he had about three hundred child pornography files including images and movies. His practice was to keep some images and delete others.

Keeping in mind that Joshua has the mentation, and the moral scruples, of a nine-year-old child, it is not surprising that he told the agent his preference was for girls under the age of fifteen and that he didn't like girls over eighteen. Dale Watson, Ph.D., is the fourth professional to evaluate Joshua and to confirm that he is mentally retarded. He testified that persons like Joshua in general have normal sexual development, but that in Joshua's case he was otherwise developmentally immature and socially very awkward, and that he likely had few friends at his own level. For Joshua, contemplating sexual interest in an adult woman would be very intimidating, because she would be so psychologically and developmentally ahead of him as to seem overpowering. While sexual attraction to children and teenagers is not necessarily a "natural consequence" of the developmental disability Joshua suffers, it is likely a factor in his interest pattern.

Dr. Watson testified that the computer depictions of child pornography were likely Joshua's expression of his sexuality, and that while it was not normative behavior, it is his only sexual expression and outlet. Furthermore, the social and family environment that Joshua was raised in, including his father's ready access and use of adult pornography, could lead to a lack of social norms and erroneous judgment. This problem is particularly perplexing given that Joshua is prone to errors in judgment and is unable to sort out in his own mind what is appropriate and what is not. Ironically, his mother, a college graduate, discovered Joshua using her computer to look at pornography so she, in her own words, "locked down on him." She installed software on her computer and on her husband's computer that prevented Joshua from uploading or downloading anything. She took no precautionary measure regarding Joshua's computer other than to extract from him a promise that he would erase the pornography on his machine. The justification she offered for permitting her mentally retarded son to have a computer with images that were not "something like a playboy pose, it was far more than that," was, "I was trying to let him make some decisions."

Joshua's ability to reason abstractly is significantly impaired. He was unable to conceptualize the meaning of proverbs during the proverb test Dr. Watson administered. For example, when asked to explain proverbs such as "people who live in glass houses should not throw stones" or "an old ox plows a straight row," Joshua was unable to abstract meaning from these statements. Not only does he lack abstract reasoning, but also his parents and his sister confirmed the significant deficits he has in day-to-day skills. He doesn't take showers as he should, he doesn't brush his teeth as he should, he doesn't comb his hair as regularly as he should, he is unkempt and his hygiene is a significant social problem.

Part of Dr. Watson's background investigation involved a home visit. His report and opinions warrant *verbatim* inclusion.

An inspection of the Larson home revealed a level of filth and disarray that is difficult to believe possible and well

beyond an acceptable standard for health and safety. The family room, which is traversed to reach Joshua's bedroom, has *large* piles of dog feces scattered about on the carpet. It is apparent that the animal routinely returns here to defecate. The smell created by the urine and feces is quite strong. Most of the surfaces in the home are covered with trash, papers or other scattered items. Joshua's room itself was covered by trash, consisting mostly of discarded soda cups, to a depth of nearly a foot. It is apparent that neither Joshua nor his parents have the initiative or capacity to extricate themselves from this situation.

Dr. Watson's testimony and manner at trial justify concluding that he is credible and reliable in his field of expertise, forensic neuropsychology.

While the government suggested at trial that Joshua is college material, the facts belie the notion. He did attend a historic preservation class at Montana Tech with his mother, but the effort was directed at trying to push him to complete tasks and perhaps reflects a familial self-deception about his intellectual capacity.

The parties stipulated that the HP Computer Model a230n, found in the Larson residence family room, contained 74 images of child pornography. The Micron PC Computer found in the same area contained one image. The eMachines Computer in Joshua's bedroom had peer to peer file sharing software and it was set to share files and to store downloaded files. There were about 37 movies stored that depicted minors engaged in sexually explicit conduct. The images depict real children and traveled in interstate or foreign commerce via the internet. The images were received and possessed between November of 2005 and May of 2006.

## III. Conclusions of Law

 Any person who knowingly receives or distributes child pornography shipped or transported in interstate commerce by a computer, or receives any material that contains child pornography that has moved in interstate commerce by a computer violates 18 U.S.C. § 2252A(a)(2), Receipt of Child Pornography. Likewise any person who knowingly possesses any computer disk that has child pornography on it is guilty of Possession of Child Pornography if the material was transported in interstate commerce by any means including by computer. 18 U.S.C. § 2252A(a)(5)(B). A person acts knowingly if he is aware of the act and does not act through ignorance, mistake or accident. *United States v. Gravenmeir*, 121 F.3d 526, 529–30 (9th Cir.1997). An individual can be convicted of both the Receipt of Child Pornography and Possession of Child Pornography, but cannot be constitutionally sentenced on both counts where the underlying conduct is the same. The Constitution requires under such circumstances that one count of conviction be dismissed without prejudice. *United States v. Davenport*, 519 F.3d 940 (9th Cir.2008); *see also United States v. Giberson*, 527 F.3d 882 (9th Cir.2008).

 The proof in this case shows beyond a reasonable doubt that Joshua Larson is guilty of both the receipt and possession of child pornography. There are, however, important considerations that must be addressed at sentencing.

### A. Post–Trial Briefing Issues

When the Court denied Larson's Motion to Dismiss Indictment, it said, "The statutes at issue here provide for punishing one who knowingly receives or possesses child pornography. If Larson's 'functioning age' prevented him from doing so, he may present evidence of this at trial." De-

fense counsel fashioned a theory of the case according to which Joshua could not have *knowingly* received and possessed child pornography because of his peculiar plight (or, as the parties referred to it in their post-trial briefing, his "diminished capacity"). At trial and in its post-trial brief, the United States mischaracterized the defense as a "diminished capacity defense to a general intent crime." Even so, it is clear from the record and from defense counsel's post-trial brief that the defense claimed simply that the government had not proved that *this* defendant acted knowingly. As Mr. Donahoe stated in his closing argument at trial:

> And the last thing I will say is that—this is—it might be nice for the government to claim that this is some kind of species of diminished capacity defense. I don't think it is.... I'm here today to put this evidence in the record.... This evidence comes on to attack the element of knowingness, it needs to be proved by the government beyond a reasonable doubt.... All I have to do is raise a doubt in Your Honor's mind.... *But to assign moral culpability to this individual, the government needs to prove more here. And they simply failed to do that and he should be acquitted.*

(Emphasis added.) The italicized portion of this paragraph is the key to the defense's argument, and it is also the argument's own demise.

Upon reading the defense's post-trial brief, it is clear that the defense is arguing that where the government has charged a defendant like Joshua with the crimes of receiving and possessing child pornography, it must prove more to show knowing intent (the element that corresponds to moral culpability) than it would were a "mainstream" (non-diminished-capacity) defendant charged with the same crimes. The argument is that here the government has not proved the element of knowingly, because in a case with these facts the

government must prove more than if the defendant was not mentally retarded. The argument goes on to urge that under the circumstances of this case there necessarily is reasonable doubt about Joshua acting knowingly.

To support this argument, the defense claims that where the prosecution charges a defendant like Joshua, the "knowingly" element of the crime carries a legal meaning other than where the government has charged a mainstream defendant. But, the language of the brief itself belies the weakness of the argument. For example, Joshua's counsel characterizes the crime at issue here as a "non-public welfare offense," and states that the Supreme Court and the Ninth Circuit "take a very dim view" of any such offense that "dispenses with the need for the government to prove scienter." The brief goes on to suggest there is some First Amendment implication here: "Criminal statutes involving First Amendment protections present special challenges when attempting to define the intent element that the government is obliged to prove."

The point of this approach to the question of what "knowingly" means in this context is to try to convince the Court that the government here not only has to prove that Joshua knew that the materials he received and possessed depicted minors engaged in sexually explicit activity, but must also prove—in order to prove that *this* defendant acted knowingly—that Joshua "appreciate[d] the wrongfulness of his act." To this the government answers, "That is not the law.... [Joshua] is not required to know that his actions were illegal in order to be prosecuted." The government is right on this point. Moreover, Joshua is not required to know that his actions were illegal in order to be convicted. Receiving and possessing child pornography are general intent crimes.

Testimony at trial established that Joshua knew the materials depicted minors engaged in sexually explicit activity. As the government stated in its brief, "The United States must only prove that Larson acted 'knowingly' in receiving and possessing child pornography, and Larson's own admissions corroborate that he did."

## B. The Implications of *Atkins*

The last paragraph of Larson's post-trial brief holds the key to the potential force of defense counsel's argument. In this paragraph, counsel briefly discusses the Supreme Court case of *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), in which the Supreme Court held that the Eighth Amendment prohibits executing mentally retarded individuals who commit capital crimes. The following sentences from the last paragraph of the defense's brief illustrate precisely how the potential force of the argument is misapplied.

> Whether cast as a Eighth Amendment problem or a Fifth Amendment due process/equal protection concern, it is not constitutional to classify defendants like Joshua along with the mine run of child pornography offenders, who are readily aware that possessing or receiving child pornography is wrong. Where, as here, the convicted offender is subjected to a 5 year mandatory prison term *the only constitutional solution is to allow defendants like Joshua … to present the diminished capacity evidence to disprove intent*, with a corresponding obligation on the government to [prove the defendant knew his conduct was wrongful].

(Emphasis added.)

This argument identifies a principle at work in *Atkins*, a constitutional principle operating in the Eighth Amendment, or *punishment*, phase of the criminal proceeding, and attempts to "pull it back" into the *pre*-punishment phase of the criminal

proceeding to stave off a conviction. The defense leaps from the Eighth Amendment punishment-phase context into the Fifth Amendment due-process context, and then concludes this must mean that the intent element requires a different quality of proof to establish intent for a mentally-retarded defendant than it does where the defendant is mainstream. The defense, however, provides no reasoned nexus from the Eighth Amendment punishment-phase jurisprudence to the Fifth Amendment, pre-punishment, due-process jurisprudence.

In its Response to Larson's Motion to Dismiss Indictment, the government identified this feature of the defense's argument: "Larson acknowledges that his sentencing challenge is premature but claims it should preclude him from being found guilty at all[.]" Again, in its post-trial brief, the government correctly identified the defense's attempt to apply a principle implicating the punishment-phase of the criminal proceeding within the pre-punishment phase, couching it as a Fifth Amendment due-process argument: "Even though a sentencing argument, Larson claimed that he could not be convicted since the sentence would be unconstitutional." This feature of the defense's argument was recognized in the Order denying Larson's Motion to Dismiss Indictment: "Larson's challenge is essentially aimed at the sentence he might receive."

The defense thus attempted to effectuate its theory of justice for Joshua by focusing on the problem of injustice this case presents because of the *sentence* Joshua faces. But the defense inaccurately asserts, as a Fifth Amendment due-process argument, the principle that addresses this problem in the Eighth Amendment punishment context. From Joshua's argument at trial and even more clearly in his pre- and post-trial briefs, it is

evident that the law simply does not conform to this argument. The evidence establishes, as set forth above, that Joshua acted knowingly under Ninth Circuit precedent.

### C. The Punishment Phase

Despite its misapplication in the Fifth Amendment due-process context, the force of Joshua's argument is nonetheless felt when it is applied in its proper context—the punishment phase of the criminal proceeding. There is an argument of principle that derives from the Supreme Court's reasoning in *Atkins,* and it applies neatly to sentencing in this case. As the government has repeatedly and correctly insisted, the Court may consider the evidence the defense presented at trial—to ostensibly (yet unpersuasively) raise a reasonable doubt on the knowingly element—in fashioning a reasonable sentence for Joshua. The government assumes this means the Court may sentence Joshua to the mandatory minimum of five (5) years. *Cf. United States v. Davenport,* 519 F.3d 940 (9th Cir.2008).

The government points out in its briefs that the Ninth Circuit has rejected challenges to congressionally mandated mandatory minimums as violative of *due process. See United States v. Wilkins,* 911 F.2d 337, 338–39 (9th Cir.1990) ("[T]he authority to define and fix the punishment for crime is legislative."). The Ninth Circuit affirmed this principle post-*Booker. See United States v. Hungerford,* 465 F.3d 1113, 1118 (9th Cir.2006) ("We already have rejected the argument that mandatory minimum sentences established by statute violate due process.") (citing *Wilkins,* 911 F.2d at 339). These holdings do not foreclose, let alone address, the question of whether the mandatory minimum here, as applied to Joshua, violates the Eighth Amendment's prohibition against cruel and unusual punishment.

In *Atkins,* the Supreme Court held that the Eighth Amendment prohibited the State of Virginia from executing a mentally retarded defendant convicted of a capital offense. 536 U.S. at 321, 122 S.Ct. 2242. The Court's reasoning justifying this conclusion proceeded through four steps. First, the Court identified the normative punitory principle—what it referred to as a "precept of justice"—"that punishment for crime should be graduated and proportioned to [the] offense." *Id.* at 311, 122 S.Ct. 2242 (quoting *Weems v. United States,* 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910)). Second, the Court specified that the graduation and proportionality requirements mean that "criminal culpability must be limited to [the defendant's] participation in [the crime], and [the defendant's] punishment must be tailored to his personal responsibility and moral guilt." *Id.* at 312–13, 122 S.Ct. 2242 (quoting *Enmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)). Third, the Court noted that while mentally retarded individuals' deficiencies "do not warrant an exemption from criminal sanctions, ... they do diminish their personal culpability." *Id.* at 318, 122 S.Ct. 2242. Fourth, the Court recognized that if the retributive purpose of the punishment Atkins faced was to be effectuated, the severity of the punishment levied against Atkins must necessarily depend on his culpability. *Id.* at 319, 122 S.Ct. 2242. To ensure that the punishment in *Atkins* was constitutionally proportioned to the defendant's personal culpability, the Court announced that the State of Virginia could not execute Atkins, whose diminished moral culpability was established by the evidence of his mental retardation. *Id.* at 319–20, 122 S.Ct. 2242.

This principled framework is instructive for evaluating the imposition of a particular punishment on a mentally retarded defendant for fitness with the Eighth Amendment's requirement that punish-

ment not be cruel and unusual. The heart of the analysis lies in the third and fourth steps of the Court's justification for its holding in *Atkins*. The testimony in Joshua's case shows clearly that while his organic deficiencies "do not warrant an exemption from criminal sanctions, ... they do diminish [his] personal culpability." *Id.* at 318, 122 S.Ct. 2242. Looking to the general purposes Congress intends criminal sentences to serve, and to the *Atkins* Court's recognition that for those purposes to be served, the severity of the punishment must necessarily depend on the offender's culpability.

### D. Joshua's moral culpability

In *Atkins*, the Supreme Court said,

[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Id.* at 318, 122 S.Ct. 2242.

As determined above, Dale G. Watson, Ph.D., a clinical and forensic neuropsychol-

ogist, testified, consistent with the *Atkins* framework, that mental retardation as clinically understood consists of three prongs: 1) significantly subaverage intellectual abilities; 2) significant deficits in adaptive functioning; and 3) the onset of the condition prior to age 18. As to the first prong, Dr. Watson testified that Joshua's IQ is 70. He testified that Joshua could sight read and spell at the third-grade level, and do arithmetic at the second-grade level. The tests revealed also that Joshua has impaired memory and learning abilities, and indicated brain dysfunction. Joshua has "very impaired mental flexibility," and exhibits "deficits in executive functioning." The proverb tests Dr. Watson administered showed that Joshua is nearly incapable of abstract reasoning. And Dr. Watson testified that Joshua's "thinking abilities" are equivalent to those of a child 8 years and 11 months of age.

As to the second prong, Dr. Watson testified that the battery of tests he administered revealed that Joshua has severely limited adaptive functioning and some degree of impulsivity. He conducted a separate inquiry, which involved questioning Joshua's mother, father, and sister, who "rated" particular aspects of Joshua's behavior. This rating was designed to assess adaptive functioning. According to Dr. Watson, "each of them rated him in the range consistent with mental retardation." Dr. Watson found the conditions within Joshua's home strongly suggested a profound deficit in the area of adaptive functioning. Dr. Watson observed, for example,

The first thing you notice on entering the house is the strong smell of urine and feces. We went back to Josh's room. There's clutter all over the place. There are things scattered over all the counters, trash, dishes. And then as you walk back into a very dark room,

through what is essentially a family room, the carpets are filthy and covered with large piles of dog feces.

Finally, he acknowledged Joshua's father's connection to the pornography in the house, and testified that this likely contributed to Joshua's failure to distinguish appropriate from inappropriate material.

As to the third prong, Dr. Watson testified that three individuals had, prior to his examination and conclusion, recognized Joshua Larson's mental retardation. He stated that Joshua was identified as a special education student in kindergarten, and that he was tested in terms of IQ and adaptive functioning on at least two occasions prior to Dr. Watson's evaluation. Dr. Watson testified in some detail that the results of the evaluations of Joshua conducted when he was a child were consistent with the three-pronged definition of mental retardation.

Measured against the Supreme Court's recognition in *Atkins* of the clinical definition of mental retardation, and of the relationship between mental retardation and personal culpability, the description of Joshua that emerges from the trial testimony compels the conclusion that Joshua's deficiencies diminish his personal culpability. The image of Joshua Dr. Watson's testimony invokes is startlingly resonant with *Atkins*'s less-culpable individual. Joshua is incontrovertibly impaired, has a "diminished capacit[y] to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318, 122 S.Ct. 2242. Like the mentally retarded as understood in *Atkins*, Joshua's "deficiencies do not warrant an exemption from criminal sanctions, but they do diminish [his] personal culpability." *Id.*

### E. Joshua's Punishment Depends on his Culpability

■ Joshua was charged with the general intent crimes of receiving and possessing child pornography. As discussed above, the evidence presented at trial establishes that Joshua acted knowingly. Because I find him guilty on both counts, but specifically Count I, he faces a mandatory minimum sentence of five (5) years in a federal prison. The Ninth Circuit recognizes Congress's authority to set mandatory minimums, and recognizes that the exercise of this authority is not violative of due process. However, under *Atkins*, which applies the punitory principle "that punishment for crime should be graduated and proportioned to [the] offense" to mentally retarded offenders, if the severity of the punishment levied against Joshua is disproportionate to his personal culpability, it violates the Eighth Amendment. Here, sending Joshua to federal prison for five years would not only violate the Eighth Amendment principle identified in *Atkins*, but also would undermine the purposes of punishment Congress has recognized for general intent crimes like those Joshua is charged with violating.

The evidence at trial established that Joshua is barely able to function in his own home. He cannot tie his shoes or ride a bike, he wets his bed, and lives in deplorable conditions. He lacks the most basic abilities to care for himself as an autonomous adult—this is, of course, because he is not an autonomous adult, but a biologically adult male with the functioning capacity of a child. On top of this, he has little guidance from his parents, who, from their appearance at trial, seem to have adaptive and social-functioning problems of their own. As defense counsel argued in closing, Joshua has not had the acculturation necessary to allow him to deal with the challenges of life generally, let alone

the challenges his peculiar organic condition and home environment impose. To send Joshua, who has the mentation of a nine-year-old child and who suffers severe adaptive functioning deficits, into a federal prison for five years is a punishment grossly disproportionate to his personal culpability.

Moreover, similar to the punishment the defendant in *Atkins* faced, to punish Joshua with a five-year prison sentence would not serve the purposes of punishing offenders for the crimes with which Joshua was charged. Congress has codified these purposes at 18 U.S.C. § 3553(a), which provides that a "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in the statute. These purposes are 1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; 2) to afford adequate deterrence to criminal conduct; 3) to protect the public from further crimes of the defendant; and 4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

None of these purposes will be served by sending Joshua to a federal prison for five years. As the Eighth Amendment analysis shows, sending Joshua to a federal prison for five years would instead constitute a purely retributive sentence wholly disproportionate to his personal culpability. Post-*Booker*, this Court's obligation is to fashion a reasonable sentence for Joshua. In light of *Atkins*, that cannot be done if I am required to adhere to the mandatory minimum, which as applied to Joshua violates the punitory principle that the severity of punishment must correspond to the personal culpability of the defendant. Such a sentence also undermines the pur-

poses of punishment as codified by Congress.

Based on the evidence presented at trial, Joshua Larson knowingly received child pornography. The evidence that defense counsel presented at trial does not raise a reasonable doubt on the knowingly element of the crime, so the evidence becomes, as the government has repeatedly insisted, relevant to the Court's obligation to fashion a reasonable sentence. This evidence reveals that the mandatory minimum sentence is, as applied to Joshua, likely unconstitutional in light of *Atkins*'s application of the punitory principles of proportionality and purposiveness in the Eighth Amendment context.

A reasonable sentence resonant with the purposes of punishment as Congress has codified them at 18 U.S.C. § 3553(a)(2) will be imposed. This solution exhibits three appropriate responses to the unique and interesting problem this case presents. It recognizes the prosecutor's exercise of discretion in bringing the charges against Joshua. It takes seriously the Court's obligation to exercise its authority, within the constraints inherent to its institutional role, to effectuate justice. And it acknowledges the reality of what is happening here—the power of the federal government has been brought to bear on a unique individual who, if the Court does not exercise its authority with deftness and care, stands to be sacrificed to the criminal justice system for no compelling or principled reason.

It is a cruel but true observation that Joshua has lived his adult life under conditions in which he is treated much like an animal. Considering the peculiar predicament in which life has placed him, it cannot be just to punish him for his violation of federal law by extinguishing what is left of his humanity—that which his family's

and his own shame have not already eclipsed.

### IV. Conclusion

THEREFORE, IT IS HEREBY ORDERED, based on these findings of fact and conclusion of law, that Joshua Larson is GUILTY of violating 18 U.S.C. § 2252A(a)(2), and is GUILTY of violating 18 U.S.C. § 2252A(a)(5)(B).

IT IS FURTHER ORDERED that Joshua Larson is no longer subject to electronic monitoring, and that all other conditions of his release shall remain in full force and effect, including his home confinement condition.

IT IS FURTHER ORDERED that sentencing in this matter will be set by separate order.